CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
for Roanoke
SEP 19 2014
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DOUGLAS A. HOGLAN,<br>    Plaintiff, | Civil Action No. 7:13-cv-00258 |
| v. | **MEMORANDUM OPINION** |
| A. DAVID ROBINSON, et al.,<br>    Defendants. | By: Hon. Jackson L. Kiser<br>Senior United States District Judge |

Plaintiff Douglas A. Hoglan, a Virginia inmate proceeding pro se, filed a verified Complaint and amendments pursuant to 42 U.S.C. § 1983, presenting fifteen claims.[1] Plaintiff names various staff of the Virginia Department of Corrections ("VDOC") as defendants. Defendants filed a motion for summary judgment, and Plaintiff responded, making the matter ripe for disposition.[2] After reviewing the record, I deny Defendants' motion for summary judgment as to claim 7 and direct Defendants to file a motion for summary judgment about that claim; deny Defendants' motion for summary judgment without prejudice as to Plaintiff's exhausted claims of retaliation due to the pendency of claim 7, and grant the motion for summary judgment as to all other claims.

I.

On January 30, 2009, Plaintiff was sentenced to fifty-one years' imprisonment[3] after he pleaded guilty to two counts of adulterate drink to injure, two counts of adulterate food, three counts of aggravated sexual battery, one count of unlawful filming/photography, and two counts of possession of child pornography.[4] Commonwealth v. Hoglan, No. CR08000102, CR08000417, CR07000982, CR07001101 (Circuit Ct. Stafford Cnty.) (available via Virginia Circuit Court Case Information, http://ewsocis1.courts.state.va.us/CJISWeb/circuit.jsp); see, e.g., Fed. R. Evid. R. 201(b)(2); In Re Katrina Canal Breaches Consol. Litig., 533 F. Supp. 2d 615, 631-33 & nn.14-15 (E.D. La. 2008);

---

[1] The Complaint, amendments, and exhibits total nearly 400 pages.
[2] The motion for summary judgment, brief in support, affidavits, and exhibits total nearly 300 pages, and Plaintiff's response is more than 150 pages.

Williams v. Long, 585 F. Supp. 2d 679, 686-88 & n.4 (D. Md. 2008). Soon thereafter, Plaintiff was transferred to the custody of VDOC officials.

While incarcerated at the VDOC's Pocahontas State Correctional Facility ("PSCC"), Plaintiff attempted to receive various books[5], flyers depicting nude women and the lascivious display of female genitalia[6], commercial photos of nude or scantily-dressed women, and periodicals[7] from sources outside the prison, but staff would intercept delivery and prevent Plaintiff's possession of these items pursuant to either PSCC Warden Young's directive that no PSCC inmate may order commercial photographs or some other VDOC or PSCC policy. Plaintiff unsuccessfully pursued administrative remedies with PSCC and VDOC officials.

In December 2011, defendant Boyd, the Senior Psychologist at PSCC, created a Case Plan Agreement ("treatment plan") that, inter alia, prohibited Plaintiff "from viewing or possessing any publications, materials, or photos which may be detrimental to the treatment plan or that may promote deviant behaviors including sexually deviant behaviors."[8] Case Plan Agt., ECF No. 47, page id. no. 820. Plaintiff signed the treatment plan on December 16, 2011, but later believed that it was created as retaliation for filing grievances about his inability to receive nude images and books. Plaintiff's continued attempts to receive pornographic photos, flyers, pamphlets, and books allegedly prompted PSCC staff to retaliate by searching his cell, seizing images of children and women, and convicting

---

[3] The state court suspended all but twenty years of the sentence, and Plaintiff will likely be released back into the community while in his early sixties.
[4] State court records reveal that the following charges were nolle prossed after he pleaded guilty: two counts of deliver adulterated food, eight counts of possession of child pornography, attempted rape, and five counts of aggravated sexual battery. Id.
[5] The books are The Girl with the Dragon Tattoo, Pathfinder: King Maker - Blood for Blood, The Flint Saga, and The Artist's Complete Guide to Facial Expressions. Although referenced in Plaintiff's Exhibit P, Plaintiff does not challenge the disposition of the book Basics of Biblical Greek.
[6] Plaintiff refers to the items as "catalogs" and "flyers" while Defendants refer to them as "flyers." The "catalog" appears to consist of forty photographs of naked women, either in single or group sexual poses, on 8 ½ inch by 11 inch paper. For consistency, I refer to the flyers/catalogs as "flyers."
[7] The periodicals were two issues of Playboy Lingerie.
[8] The stated goal of the treatment plan was to address Plaintiff's "destructive sexual issues" due in large part to his "probable" criminal thinking observation, which indicates a lack of acceptance of responsibility for his criminal conduct. ECF No. 47, page id. no. 820.

2

Plaintiff of various institutional infractions for violating the terms of the treatment plan.[9] Plaintiff believes these acts were unlawful retaliation because Plaintiff had been allowed to receive such items during his prior two years in the VDOC and did not help Boyd develop the treatment plan.

The institutional convictions ultimately led to Plaintiff's ninety-day transfer to the PSCC Structured Living Unit ("SLU"), which is a housing assignment that is more controlled than general population but less than segregation. See VDOC Operating Procedure ("OP") 841.7. After arriving at the SLU on November 6, 2012, Plaintiff no longer had physical access to the PSCC law library although he could still communicate with the private attorney assigned to PSCC and could request specific legal materials from his unit counselor and the inmate law-library clerks. Plaintiff found this system to be less convenient and effective than if he had physical access to the law library.

Plaintiff argues fifteen multi-faceted claims involved with his incarceration at the PSCC, enumerated[10] as follows:

Claim 4.  Young, Garman, A. Robinson, Collins, Copeland, and Aldridge violated Plaintiff's First Amendment right to receive information in prison and the Fourteenth Amendment[11] right to due process by not adhering to the "Specific Criteria for Publication Disapproval" outlined in OP 803.2, "Incoming Publications," when preventing Plaintiff's receipt of the book The Girl with the Dragon Tattoo.

Claim 5.  Mould violated Plaintiff's First Amendment right to receive publications in prison and Fourteenth Amendment right to due process when Mould screened and disapproved flyers "as a group" instead of each flyer, and Turner, Bivens, and G. Robinson obstructed administrative remedies by denying grievances about Mould.

---

[9] The items seized as contraband in violation of the treatment plan included a page of forty photos of single women or groups of women in sexually-suggestive positions or engaging in sexual acts; a page depicting naked, very small children and the naked breasts of females as young as fifteen-years old; an erotic story selection form by which Plaintiff was requesting stories based on anal sex and anal and group sex; a photography magazine; a company's order forms for magazines depicting sexual penetration and titled "Barely Legal," "D-Cup," "Big Butt," "Live Young Girl Presents Latinos," etc; an order form for non-nude female celebrities' pictures; pages from an anatomy book published by National Geographic; an advertisement that features multiple pictures of a young, clothed girl; a page from "Shutterbug" magazine that has three pictures of clothed children in different poses; and graphic, detailed drawings of lesbian and group sex.

[10] Claims 1 through 3 were filed in the name of a co-plaintiff, who has since been severed from this action. I continue to use the claim numbers Plaintiff and Defendants used in their filings.

[11] Plaintiff repeatedly argues that the applicable right to due process is protected by both the Fifth and Fourteenth Amendments, but the Fifth Amendment's due process clause applies only to the federal government. See, e.g., Betts v. Brady, 316 U.S. 455, 462 (1942).

3

Claim 6.   Walz, Rowelette, and Hinkle violated Plaintiff's First Amendment right to receive publications in prison and Fourteenth Amendment right to due process by disapproving and refusing to screen commercial photographs on a "case-by-case" basis.

Claim 7.   Young, Walz, Hinkle, Garman, A. Robinson, and Clarke violated Plaintiff's First Amendment right to receive publications in prison and Fourteenth Amendment right to due process by banning all commercial photographs, including those with adult content, and G. Robinson obstructed administrative remedies.

Claim 8.   Turner and members of the PRC violated Plaintiff's First Amendment right to receive publications in prison and Fourteenth Amendment right to due process by denying Plaintiff receipt of publications based on "role playing," and G. Robinson obstructed administrative remedies.

Claim 9.   Hall, Boyd, and Davis violated Plaintiff's First Amendment right to receive publications in prison and Fourteenth Amendment right to due process by enacting a treatment plan that prohibited him from possessing various publications, Boyd created the treatment plan as retaliation, and Turner, Bivens, and Robinson obstructed administrative remedies.

Claim 10.   Hall, Boyd, and Ziegler retaliated against Plaintiff for filing this lawsuit by charging him with possession of contraband.  Bandy and Walz subsequently violated the Fourteenth Amendment right to due process by not conducting a fair disciplinary hearing and by affirming the institutional conviction on appeal, respectively.

Claim 11.   Hall, Cartwright, and Sutphin retaliated against Plaintiff for filing this lawsuit.  Cartwright violated the Fourteenth Amendment right to due process when he seized Plaintiff's property and did not return it, and Turner, Bivens, Walz, and Hinkle obstructed administrative remedies.

Claim 12.   Boyd charged Plaintiff with possession of contraband as retaliation for filing grievances and this lawsuit, violated the First Amendment right to receive publications in prison, and violated the Fourteenth Amendment right to due process by seizing Plaintiff's personal photos.  Bandy and Young violated due process by not conducting a fair disciplinary hearing and affirming the institutional conviction, respectively, and Turner and Bivens obstructed administrative remedies.

Claim 13.   Boyd charged Plaintiff with possession of contraband as retaliation for filing grievances and this lawsuit, and Bandy and Young violated the Fourteenth Amendment right to due process by not conducting a fair disciplinary hearing and affirming the institutional conviction, respectively.

4

Claim 14. Hammond, Walz, Young, Hinkle, Garman, A. Robinson, and Clarke violated the federal right to access courts by creating a policy that caused inadequate access to the prison law library during Plaintiff's confinement in the SLU, which precluded Plaintiff from raising another claim in this action.[12]

Claim 15. Boyd retaliated against Plaintiff by recommending that Plaintiff be housed in the SLU. Walz, Rowlette, Young, Hinkle, Garman, A. Robinson, and Clarke violated the Fourteenth Amendment right to due process by not providing a hearing before being housed in the SLU, and Turner obstructed administrative remedies.[13]

Claim 16. Turner, Bivens, and G. Robinson obstructed administrative remedies.[14]

Claim 17. PRC members violated the First Amendment right to receive publications while in prison and the Fourteenth Amendment right to due process by disapproving Plaintiff's receipt of the October/November 2012 issue of Playboy Lingerie.[15]

Claim 18. Boyd and Young violated the First Amendment right to receive publications in prison and Fourteenth Amendment right to due process by confiscating from Plaintiff the prison-library book The Artist's Complete Guide to Facial Expressions as violating Plaintiff's treatment plan, and Boyd retaliated against Plaintiff by charging him with possession of contraband.

## II.

Defendants argue in their motion for summary judgment that the claims for damages asserted against them in their individual capacities are barred by the doctrine of qualified immunity.[16] A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing

---

[12] Plaintiff concedes in his response to the motion for summary judgment that he was not bringing an independent claim against Young, Garman, and A. Robinson for allegedly violating the First Amendment right to receive publications in prison by denying Plaintiff's receipt of the February/March 2011 issue of Playboy Lingerie.

[13] Plaintiff withdrew a related claim that Plaintiff suffered double jeopardy by being transferred to the SLU. ECF no. 57.

[14] Plaintiff acknowledges that claim 16 is not based on an alleged lack of "serviceable clothes" although that issue is discussed in the Complaint. Pl.'s Resp. to Mot. Summ. J. at page id. no. 915.

[15] Plaintiff withdrew a related claim that A. Robinson and Clarke violated the First Amendment by enacting a policy that barred Plaintiff from appealing already disapproved publications via the Offender Grievance Procedure. ECF no. 57.

[16] Qualified immunity permits government officials performing discretionary functions in individual capacities to be "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993) (describing burden shifting). Defendants are protected from damages in their official capacities by the Eleventh Amendment. See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977).

the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial.[17] Id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

### III.

Defendants argue that Plaintiff failed to exhaust available administrative remedies for claims 5, 7, 9, 11, 12, and 17, as required by 42 U.S.C. § 1997e(a).[18] The exhaustion requirement is mandatory and "applies to all inmate suits about prison life[.]" Porter v. Nussle, 534 U.S. 516, 524, 532 (2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90 (2006). When a prison provides an administrative grievance procedure, the inmate must file a grievance raising a particular claim and pursue it through all available levels of appeal to "properly exhaust." Id.; Dixon v. Page, 291 F.3d 485, 490-91 (7th Cir. 2002). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process . . ., the process that exists on paper becomes unavailable in reality." Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006).

---

[17] A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).
[18] A defendant has the burden to prove an inmate's failure to exhaust available administrative remedies. Jones v. Bock, 549 U.S. 199, 216 (2007).

OP 866.1, "Offender Grievance Procedure," provides the administrative remedies for inmates to resolve complaints, appeal administrative decisions, and challenge policies and procedures.[19] Before submitting a grievance, the inmate must make a good-faith effort to informally resolve the issue by submitting an Informal Complaint form, which is available in housing units. If the issue is not informally resolved, the inmate must file a regular grievance within thirty calendar days from the date of the occurrence or incident.[20] Regular grievances may receive three levels of review. A facility's Warden or Superintendent conducts the first, "Level I" review, and if the inmate is unsatisfied with the Level I determination, the inmate may appeal within five days of receipt to Level II, which is usually done by a regional ombudsman. For most issues, Level II is the final level of review, but for the few issues appealable to Level III, the inmate may appeal to the Deputy Director or Director of the VDOC within five days of receipt of the Level II response.[21]

A. Claims 5, 9, and 12 are barred by § 1997e(a).

For claim 5, Plaintiff alleges that staff unlawfully screened flyers "as a group" and obstructed administrative remedies. Plaintiff filed a regular grievance about the fliers, but it was rejected at intake for "insufficient information." Per OP 866.1, staff returned the grievance and advised Plaintiff that he needed to wait and file a grievance after the PRC determined whether the flyers should be disapproved.[22] Nothing suggests that Plaintiff exhausted administrative remedies once the PRC decided to prohibit the flyers. Plaintiff's premature grievance, which was rejected at intake, is not a

---

[19] All issues are grievable except about policies, procedures, and decisions of the Virginia Parole Board; disciplinary hearing penalties and/or procedural errors; state and federal court decisions, laws, and regulations; and other matters beyond the VDOC's control.

[20] Only one issue per regular grievance may be addressed. Regular grievances that do not meet the filing requirements of OP 866.1 are returned to the inmate within two working days from the date of receipt with instructions, when possible, about how the inmate may remedy any deficiency, and a copy of the intake decision is kept in the inmate's grievance file. An inmate may appeal an intake decision by sending the grievance and the intake decision to a regional ombudsman within five days of receipt, but there is no further review of the intake decision.

[21] A Level I response must be issued within thirty days, and Level II and Level III responses must be issued within twenty days. Expiration of the time limit without issuance of a response at any stage of the process automatically entitles an inmate to appeal to the next level.

[22] Plaintiff appealed the intake decision to the Regional Ombudsman, who upheld the intake decision.

7

valid exhaustion, and staff's rejection of the premature grievance did not make administrative remedies unavailable.

For claim 9, Plaintiff alleges that staff unlawfully enacted a treatment plan that prohibited him from possessing various publications as retaliation and obstructed administrative remedies. The treatment plan, which prohibited the possession of any risqué image, was enacted on December 16, 2011, Plaintiff did not file the relevant grievances until March 2012, and the grievances were properly rejected as untimely filed. Nothing "beyond Plaintiff's control" prevented Plaintiff from timely grieving the conditions described in the treatment plan, and the rejections of the untimely grievances did not make administrative remedies unavailable.

For claim 12, Plaintiff alleges that staff unlawfully intercepted publications, seized Plaintiff's family photos, obstructed administrative remedies, and charged and convicted Plaintiff of possession of contraband as retaliation for filing grievances and this lawsuit.[23] Plaintiff filed an unsuccessful regular grievance about the confiscated family photos, and Plaintiff did not appeal the decision to Level II. Plaintiff's arguments are not persuasive that staff made remedies unavailable and that subsequent grievances about Boyd's alleged retaliation, which also were not appealed, excuse his failure to exhaust the initial grievance.

B. Claims 7, 11, and 17 are not barred by § 1997e(a).

For claim 7, Plaintiff alleges that staff unlawfully banned commercial photographs, including photographs with adult content, and obstructed administrative remedies. Plaintiff filed an unsuccessful regular grievance on April 5, 2012, about the ban on commercial photographs, and Plaintiff appealed the Level I decision to Hinkle, who upheld the Level I decision on May 25, 2012. On the Level II response form, Hinkle informed Plaintiff that he could appeal to Level III by May 30, 2012. Plaintiff

---

[23] Plaintiff's complaints about the disciplinary conviction are not grievable via OP 866.1

8

drafted his appeal on June 14, 2012, and the appeal was allegedly not received at Level III until June 27, 2012, long after the five-day appeal period expired.

However, Plaintiff argues that the Level III appeal was timely filed because he mailed it on June 14, 2012, which, notably, was the day after he allegedly received the Level II response. In support of this claim, the evidence reveals that, in response to Plaintiff's inquiry, staff told him on June 6, 2012, that Hinkle's Level II response had been created on May 28, 2012, but ostensibly it had not yet arrived at the prison by June 6, 2012, because staff further explained that it "d[id] not mean that it has been processed and mailed." Staff reassured Plaintiff that he "will have an appropriate amount of time to take whatever steps . . . need[ed] to take. . . ." Confusingly, Turner said in her response dated June 13, 2012, that the appeal for this claim was pending at Level III review, despite both Plaintiff's claim that he did not mail the appeal until June 14, 2012, and Robinson's letter claiming the Level III appeal was received on June 27, 2012. In yet another document, Robinson stated that Plaintiff's unspecified "paperwork" for the grievance was received on July 2 and 25, 2012. Due to the disparity of the evidence and discrepancies in the VDOC's own records, Defendants presently fail to establish that Plaintiff did not timely file the Level III appeal within one day of receiving the Level II response.[24] See OP 866.1 § VI(D)(5) (permitting an inmate five days from the date of receipt to appeal a grievance response).

For claim 11, Plaintiff alleges that staff unlawfully seized Plaintiff's property, obstructed administrative remedies, and retaliated when Plaintiff filed a lawsuit.[25] Plaintiff submitted a regular grievance about the cell search being retaliation, which was rejected at intake as a "request for services."[26] I cannot find that claim 11 is barred by § 1997e(a) because staff conceded in the intake

---

[24] Due to the confusing record, Defendants are permitted to again address the exhaustion of available remedies for this claim in the motion for summary judgment requested in Part IV.

[25] Defendants concede that Plaintiff exhausted administrative remedies about his property being seized during a cell search.

[26] Although Defendants allege that Plaintiff did not appeal the intake decision, page three of Plaintiff's exhibit #AL indicates that Plaintiff did appeal and that the Regional Ombudsman upheld the intake decision.

response that the complaint did not fall within the scope of OP 866.1. Furthermore, the Regional Ombudsman upheld the intake decision on appeal, and thus, the grievance process was not available for the complaint about retaliatory search as it is not clear how the complaint qualified as a "request for services."

For claim 17, Plaintiff alleges that PRC members unlawfully disapproved Plaintiff's receipt of the October/November 2012 issue of Playboy Lingerie. Defendants argue that the claim is unexhausted because Plaintiff never appealed the PRC's disapproval of the publication. However, the relevant Notification of PRC Disapproval specifically told Plaintiff that the determination was "not subject to appeal through the Offender Grievance Procedure." Thus, OP 866.1 was not an available remedy for this claim.

## IV.

Claims 4, 7, 8, 17, and 18 concern Plaintiff's First Amendment rights while incarcerated. Claim 7 specifically concerns an alleged ban on PSCC inmates' receipt of commercial photographs, including erotic photos. Defendants did not address the merits of this claim in their motion for summary judgment, and thus, they shall file a motion for summary judgment that addresses the merits of claim 7. After reviewing the other First Amendment claims and Defendants' responses, I conclude that Defendants are entitled to qualified immunity and summary judgment for claims 4, 8, 17, and 18.

Inmates "clearly retain protections afforded by the First Amendment[.]" O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). However, inmates' First Amendment rights must be balanced with prisons' institutional needs of security, discipline, and general administration. Id. at 349. Thus, "a prison regulation that abridges inmates' constitutional rights is 'valid if it is reasonably related to legitimate penological interests.'" Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (citing Turner v. Safley, 482 U.S. 78, 84 (1987)). Whether a regulation is reasonably related depends on:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so

10

remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

Id. at 200 (citing Turner, 482 U.S. at 89-92). The prisoner has the burden to disprove the validity of a prison regulation pursuant to the Turner analysis. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Prison administrators are entitled to deference in their management of penal facilities. Lovelace, 472 F.3d at 199. For example, courts should not "second-guess a prison administrator's choice among alternative policies unless an alternative exists that would meaningfully enhance an inmate's ability to exercise his constitutional rights." Hause v. Vaught, 993 F.2d 1079, 1083 (4th Cir. 1993).

VDOC policy permits mental health staff to prohibit an inmate's possession of an item "determined to be detrimental to offender rehabilitative efforts" based on the inmate's "specific criminogenic factors." OP 803.2 § IV(O)(1)-(3). The inmate may appeal a confiscation based on such a determination to the PRC. The PRC is responsible for reviewing publications submitted from VDOC facilities to determine if the publications are appropriate for inmates' possession. The PRC reviews publications to ensure they are in compliance with OP 803.2, "Incoming Publications," by reviewing items based on the criteria set forth in OP 803.2, specifically whether content promotes gang-affiliation, terror, violence, of disorder; whether content violates state or federal law; whether content contains sexually explicit acts, including sexual acts in violation of state or federal law; or whether content threatens the safety and security of the institution. Notably, "[w]hen a portion of a publication is disapproved, the entire publication will be disapproved. There will be no attempt to remove or censor the disapproved material." OP 803.2 § IV(G)(9). Publications disapproved by the PRC are compiled into a Disapproved Publications List, which staff can consult to deny an inmate's receipt of a disapproved publication without repeatedly having to send the item to the PRC.

11

Plaintiff fails to establish that the disapprovals of the The Girl with the Dragon Tattoo, The Artist's Complete Guide to Facial Expressions, The Flint Saga, the October/November 2012 issue of "Playboy Lingerie," and Pathfinder: King Maker - Blood for Blood violated the First Amendment. The Girl with the Dragon Tattoo's description of criminal sexual violence between a woman and her probation officer satisfies the PRC's reasonable concerns about preventing materials describing illegal sexual behavior and promoting violence and disorder.

Boyd, the Senior Psychologist at PSCC, disapproved Plaintiff's possession of The Artist's Complete Guide to Facial Expressions as a violation of his treatment plan. By itself, facial sketches of young girls seem innocuous. However, I benefit from the record in this case and view the book in the context of Plaintiff's crimes and behavior in prison. It was reasonable for Boyd to disallow possession of a book that may promote deviant behaviors by teaching Plaintiff how to draw young girls, similar to Plaintiff's hand-drawn sketches of young females engaging in group sex.[27] Similarly, the denials of The Flint Saga in April 2012 and the October/November 2012 issue of "Playboy Lingerie" in April 2013 were reasonable, regardless of whether the items were on the PRC's Disapproved Publication List, in light of their highly-sexual content, the relevant prohibition described in Plaintiff's treatment plan, and Plaintiff's obstinate refusal to conform to the treatment plan.[28]

Pathfinder: King Maker - Blood for Blood, an alleged role-playing book that would contain numerous acronyms and combinations of letter and numbers, was added to the PRC's Disapproved Publications List for being "material written or communicated in code or written in a foreign (non-English) language other than English or Spanish." Collins, a former PRC chairman, avers that the regulation prohibiting material written in code or in a foreign language is necessary because "[the]

---

[27] Just as troubling and detrimental to his treatment would be Plaintiff re-living his crimes by drawing himself engaging in sexual acts with his victims.

[28] The PRC determined that the Playboy issue contained at least one depiction or oral sex and that The Flint Saga contained material that emphasizes explicit or graphic depictions or descriptions of sexual acts, including, but not limited to, bondage, sadistic, masochistic, or other violent acts in the context of sexual activity, in violation of OP 803.2. Plaintiff filed a copy of just one picture from the Playboy magazine, which shows a naked woman with exposed breasts and genitalia.

12

VDOC does not have the resources to translate each publication that contains a foreign language that comes into a facility which could become a security issue if the information cannot be verified as appropriate for the facility." The regulation is rationally related to the prison's interest to efficiently allocate scarce resources and prevent unknown, possibly disruptive materials from disseminating into the inmate population. See, e.g., DePaola v. Fleming, 474 F. App'x 120, 120 (4th Cir. 2012) (affirming district court finding that this regulation and its rationale do not violate the First Amendment). VDOC officials have a legitimate interest in maintaining safety and order within the institution. See Hodges v. Virginia, 871 F. Supp. 873, 876 (W.D. Va. 1994) (finding that security, discipline, order, public safety, and rehabilitation interests need no defense), rev'd on other grounds, Montcalm Publ. Corp. v. Beck, 80 F.3d 105 (4th Cir. 1996). Prison officials do not need to wait for a particular disruption to occur before they can take reasonable measures to abate it. Instead, "responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 132-33 (1977). Even without access to this particular role-playing book, Plaintiff retains alternative means of obtaining access to information and ideas through many other publications that the VDOC would allow him to receive. Plaintiff does not explain any "obvious, easy alternative," and thus, restricting Plaintiff's possession of Pathfinder: King Maker - Blood for Blood does not violate the First Amendment because "responsible, experienced administrators have determined, in their sound discretion, that such [materials written in code] will jeopardize the security of the facility." Block v. Rutherford, 468 U.S. 576, 586 (1984).

V.

Although the remaining claims allege violations of federal law, Plaintiff fails to either identify a protected interest or sufficiently state a claim actionable via 42 U.S.C. § 1983. Accordingly,

13

Defendants are entitled to qualified immunity and summary judgment for all remaining claims, except for the retaliation claims, for the following reasons.

Plaintiff repeatedly cites Defendants' failures to comply with state laws, procedures, or customs, but such an accusation fails to state an actionable claim. A claim that prison officials have not followed their own independent policies or procedures does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1978); Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue).

Plaintiff's challenged institutional disciplinary convictions resulted in the loss of recreation and telephone privileges. Because the loss of these privileges do not implicate a property or liberty interest, the Fourteenth Amendment protections described in Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974), were not implicated at the relevant institutional hearings. To the extent Plaintiff forfeited contraband, the record reveals that Plaintiff was afforded advanced written notice of the claimed violations; disclosure of adverse evidence; the opportunity to call witnesses and present relevant evidence except when defendant Bandy, the impartial hearing officer, found good cause to exclude irrelevant evidence; and a written statement of the facts and evidence relied upon and the reasons for the disciplinary action taken.[29] Plaintiff's unsupported conclusion that Bandy was not impartial is not entitled to an assumption of truth. See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (recognizing a plaintiff's basis for relief requires more than labels and conclusions). Even if it were, the record, including Plaintiff's own statements, reveals that more than just "some evidence" established Plaintiff possessed contraband and violated the terms of the treatment plan. See, e.g.,

---

[29] Even though not required by Wolff, the VDOC additionally allows a prisoner an administrative appeal for each conviction, which Plaintiff also availed himself. I note that Plaintiff does not allege that he did not receive a written summary of findings for the October 9, 2012, disciplinary hearing or was denied the assistance of an advisor or the ability to call a witness. Am. Compl. ¶¶ 112-16, 180, Ex. T, p. 1, 5.

14

Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455-56 (1985). Furthermore, disciplinary proceedings that ultimately terminated in Plaintiff's favor cannot constitute a due process violation.

The United States Constitution does not enumerate a fundamental privacy right, and the Supreme Court has never proclaimed a "general constitutional right to privacy." Whalen v. Roe, 429 U.S. 589, 607-08 (1977) (Stewart, J., concurring). However, the Supreme Court has held that an inmate does not have an expectation of privacy in his prison cell because prison administrators need to ensure security within the prison. Hudson v. Palmer, 468 U.S. 517, 525-28 (1984). Accordingly, Plaintiff's complaints about prison staff repeatedly searching his cell warrant no relief via § 1983.

Allegations that Virginia prison officials intentionally or negligently deprived an inmate of property while acting outside the scope of official policy or custom do not state any constitutional claim because the Virginia Tort Claims Act, Virginia Code § 8.01-195.3, is a meaningful post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517, 533 (1984); Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in irrelevant part by Daniels v. Williams, 474 U.S. 327, 330-31 (1986)). Also, a post-deprivation, due process hearing was not necessary after Plaintiff transferred the family photos to someone outside the VDOC because the state did not confiscate the property.

Although Plaintiff complains about the conditions of confinement in the SLU, none of the conditions he experienced is an atypical and significant hardship in relation to the ordinary incidents of prison life or give rise to the protection of the Fourteenth Amendment's Due Process Clause by its own force. See, e.g., Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997). Plaintiff does not have a constitutional right to be placed in a specific security classification, and custodial classifications do not create a major disruption in a prisoner's environment. Sandin v. Conner, 515 U.S. 472, 486-87 (1995). Plaintiff also does not have a federal right to prison privileges like a prison job, commissary, recreation, visitation, or general prison programming. See, e.g., Madison v. Parker, 104 F. 3d 765, 768 (5th Cir. 1997); Bulger v. United States Bureau of Prisons, 65 F.3d 48, 50 & n.3 (5th Cir.1995);

15

Strickler v. Waters, 989 F.2d 1375, 1381 n.7 (4th Cir. 1993); White v. Keller, 438 F. Supp. 110, 115 (D. Md. 1977), aff'd, 588 F.2d 913 (4th Cir. 1978) (per curiam).

Plaintiff does not have a constitutional right to access a grievance system. Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). Also, "[a] superior's after-the-fact denial of a grievance [or response to a letter] falls far short of establishing § 1983 liability." DePaola v. Ray, No. 7:12cv00139, 2013 U.S. Dist. LEXIS 117182, at *23, 2013 WL 4451236, at *8 (W.D. Va. July 22, 2013) (Sargent, M.J.). Furthermore, supervisory liability under § 1983 may not be predicated on the theory of respondeat superior. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7 (1978); Fisher v. Washington Metro. Area Transit Author., 690 F.2d 1133, 1142-43 (4th Cir. 1982). Consequently, Plaintiff's numerous claims about how Defendants responded to his grievances and appeals and that Defendants frustrated his access to OP 866.1 do not state a claim actionable via § 1983.

Although Plaintiff complains about depression, a bipolar condition, and sciatic-nerve pain, he acknowledges that each of these maladies is being addressed via consultations with medical personnel or drugs. The fact that these conditions frustrate his ability "to play sports or do major activities" does not state an Eighth Amendment claim for cruel and unusual punishment against Defendants.

In claim 14, Plaintiff alleges his right to access the courts was violated because a policy prevented Plaintiff from physically retrieving law library materials while housed in the SLU.[30] Inmates have a constitutional right to reasonable access to courts to challenge their convictions or vindicate their constitutional rights. Bounds v. Smith, 430 U.S. 817, 838 (1977). However, inmates do not have a freestanding right to a law library or legal assistance. Lewis v. Casey, 518 U.S. 343, 351 (1996). Instead, prison officials must provide a "capability of bringing contemplated [nonfrivolous] challenges to sentences or conditions of confinement before the courts." Id. at 356. The Supreme

---

[30] Instead of physically accessing the prison law library, Plaintiff requested several materials at a time by writing legal citations on a form that he returned to a unit manager. The form was forwarded to inmate law-library clerks who retrieved the items, if possible, and had the materials delivered to the SLU.

16

Case 7:13-cv-00258-JPJ-RSB   Document 64   Filed 09/19/14   Page 16 of 18   Pageid#: 1078

Court in Lewis "le[ft] it to prison officials to determine how best to ensure that inmates . . . have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement[,]" and noted that "it is that capability, rather than the capability of turning pages in a law library, that is the touchstone" of a constitutional right to access courts.

Plaintiff acknowledges, and the record confirms, that Plaintiff accessed numerous prison law-library resources from inmate law clerks via the citation method and also consulted with a licensed attorney who assists inmates, pursuant to Virginia Code § 53.1-40. Even in addition to the ability to remotely access law library resources, "the service of the attorney[] appointed by the State to assist prisoners complied with the requirements of Bounds." Almond v. Davis, 639 F.2d 1086, 1090 (4th Cir. 1981). Consequently, Plaintiff fails to establish that a defendant denied him reasonable access to courts.

Furthermore, the right of reasonable access to courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court[,]" and a plaintiff must specifically identify a non-frivolous legal claim that a defendant's actions prevented him from litigating. Christopher v. Harbury, 536 U.S. 403, 415-16 (2002). This requirement means the "inmate must come forward with something more than vague and conclusory allegations of inconvenience or delay in his instigation or prosecution of legal actions. . . . The fact that an inmate may not be able to litigate in exactly the manner he desires is not sufficient to demonstrate the actual injury element of an access to courts claim." Godfrey v. Washington Cnty., Va., Sheriff, No. 7:06-cv-00187, 2007 U.S. Dist. LEXIS 60519, at *39, 2007 WL 2405728, at *13 (W.D. Va. Aug. 17, 2007) (Turk, J.).

Plaintiff complains that his alleged frustrated physical access to the law library during his ninety-day stay in the SLU caused him to forfeit a claim to the applicable two-year statute of limitations. Implicit in that argument is the fact that the forfeited claim accrued more than two years before he filed this action. Plaintiff does not address how Hammond, Walz, Young, Hinkle, Garman,

17

A. Robinson, and Clarke interfered with Plaintiff's ability to file suit about the claim during the two-year limitations period, which ran both before and after Plaintiff's ninety-day stay in the SLU.

Lastly, Plaintiff's Amended Complaint against Defendants is replete with accusations of retaliation. I defer disposition of Plaintiff's exhausted claims of retaliation until I am able to adjudicate claim 7. See, e.g., Adams, 40 F.3d at 75 (recognizing retaliation must have occurred with regard to the exercise of some constitutionally protected right or the retaliatory action itself violated such a right).

## VI.

For the foregoing reasons, I deny Defendants' motion for summary judgment as to claim 7 and direct them to file a motion for summary judgment; deny Defendants' motion for summary judgment without prejudice as to Plaintiff's exhausted claims of retaliation due to the pendency of claim 7, and grant the motion for summary judgment as to all other claims.

ENTER: This 19th day of September, 2014.

*/s/ Jackson L. Kiser*
Senior United States District Judge

18